UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                               :
ATLANTIC AUTOCARE, INC., et al.,             :
                                               :
                       Plaintiffs,        :
                                               :      06 Civ. 4242 (SHS)
            -against-                           :
                                             :      OPINION & ORDER
SHELL OIL PRODUCTS COMPANY LLC (f/k/a  :
SHELL OIL PRODUCTS COMPANY), SHELL OIL :
COMPANY, and MOTIVA ENTERPRISES LLC,  :
                                             :
                       Defendants.      :
                                             :
------------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

        Plaintiffs currently operate—or have operated—gas stations in the New York City area. They sell either "Shell" or "Texaco" brand gasoline under franchise agreements with defendant Motiva Enterprises LLC, a joint venture of the Shell Oil Company, Texaco, Inc., and Saudi Aramco.

        Plaintiffs allege that Motiva, as well as defendants Shell Oil Products Company LLC and Shell Oil Company, have terminated or "constructively terminated" their franchise agreements in violation of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801-06. Plaintiffs also allege that defendants have breached the parties' franchise agreements by setting gasoline prices in violation of the open price term provision of N.Y. U.C.C. § 2-305.

        Following fact and expert discovery, defendants have moved for summary judgment with respect to each of plaintiffs' claims. Summary judgment for defendants is granted. First, a claim of "constructive termination" under the PMPA is actionable only in the context of an assignment of a franchise agreement, and plaintiffs admit that they have not brought a constructive

1

termination claim based on an assignment. Second, plaintiffs have failed to offer evidence in support of a claim of actual termination under the PMPA. Third, based on the evidence in this record, no reasonable finder of fact could conclude that defendants have violated N.Y. U.C.C. § 2-305 by setting the price of gasoline in bad faith.

## I.   BACKGROUND

The Second Amended Complaint originally contained five claims for relief, but plaintiffs voluntarily withdrew Count Three, which alleged violations of the Robinson-Patman Act, 15 U.S.C. § 13a (Order, June 13, 2008). In addition, Count Five, which alleged a breach of contract based on defendants' automated gas delivery system, was dismissed pursuant to Fed. R. Civ. P. 12(b)(6) (Order, Apr. 13, 2007).

Furthermore, many of the original thirty-two plaintiffs are no longer a part of this action. Nine plaintiffs voluntarily withdrew (Order, Sept. 18, 2007; Order, Mar. 7, 2008), and one was dismissed for failure to respond to discovery requests (Order, July 13, 2007). Summary judgment was granted with respect to six plaintiffs that had signed releases barring their claims against defendants. (Order, Mar. 7, 2008.)

There are now three claims remaining in this action. Plaintiffs assert two counts based on the PMPA—one for injunctive relief (Count One) and one for money damages (Count Two)— and one count (Count Four) based on the open price term provision of N.Y. U.C.C. § 2-305.

## II.   DISCUSSION

Summary judgment is appropriate if the evidence shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether a genuine issue of material fact exists, the Court "is to resolve all ambiguities and draw all

permissible factual inferences in favor of the party against whom summary judgment is sought." *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004). The non-moving party, however, "may not rely on mere conclusory allegations or speculation, but instead must offer some hard evidence" in support of its factual assertions. *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998).

      A.    <u>"Constructive Termination" Under the PMPA</u>

Plaintiffs allege that defendants have charged "unconscionably high rents," "control[ed] Plaintiffs' requests for the delivery of gasoline," "increased prices for wholesale gas," and directly competed with plaintiffs "in the retail sale of gasoline." (Second Am. Compl. ¶¶ 106, 112-13.) All of this, plaintiffs claim, has been part of an effort by defendants to "constructively terminate" the parties' franchise agreements in violation of the PMPA. (*Id.*)

The Second Circuit has not yet determined whether to recognize claims of "constructive termination" under the PMPA.[1] Defendants, therefore, urge this Court to hold that constructive termination claims are never actionable under the PMPA. Plaintiffs, in turn, ask this Court to hold that constructive termination claims are actionable under the standards articulated by the First Circuit in *Marcoux v. Shell Oil Prods. Co.*, 524 F.3d 33, 45 (1st Cir. 2008), and the Fourth Circuit in *Barnes v. Gulf Oil Corp.*, 795 F.2d 358, 360-64 (4th Cir. 1986). Whether or not constructive termination claims are actionable need not be decided in this action because plaintiffs' constructive termination claims fail even if this Court adopts the approaches set forth in *Marcoux* and *Barnes*.

---

[1] In *Ackley v. Gulf Oil Corp.*, 726 F. Supp. 353, 359 (D. Conn. 1989), the district court applied *May-Som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d 917, 922 (6th Cir. 1989), and denied a constructive termination claim. The Second Circuit affirmed "substantially for the reasons given in that opinion." *Ackley v. Gulf Oil Corp.*, 889 F.2d 1280, 1281 (2d Cir. 1989); *see also Cedar Brook Serv. Station, Inc. v. Chevron U.S.A., Inc.*, 746 F. Supp. 278 (E.D.N.Y. 1990), *aff'd mem.*, 930 F.2d 908 (2d Cir. 1991).

3

### 1. *The PMPA*

The PMPA provides uniform national standards for the "termination or nonrenewal" of gasoline franchise agreements. *See* 15 U.S.C. § 2802. "Both the text and the structure of the Act indicate that Congress enacted the PMPA to address the disparity in bargaining power then existing between franchisors (typically major oil companies) and franchisees in the petroleum industry, and to level the playing field on which these parties interact." *Dersch Energies, Inc. v. Shell Oil Co.*, 314 F.3d 846, 855 (7th Cir. 2002); *see also Bellmore v. Mobil Oil Corp.*, 783 F.2d 300, 304 (2d Cir. 1986). Accordingly, the PMPA prohibits franchisors from terminating or declining to renew franchise agreements unless certain enumerated conditions are met. *See* 15 U.S.C. §§ 2802-04. It also provides a cause of action to a franchisee harmed by its franchisor's failure to comply with certain parts of the Act. *See id.* § 2805.

The PMPA "was not," however, "designed to provide franchisees with a federal forum for the resolution of run-of-the-mill contract disputes." *Dersch*, 314 F.3d at 861-62. Instead, the "regulation of petroleum franchise relationships has traditionally been a matter of local concern in which the parties frame their relationships with reference to state law." *Id.* Thus, disputes between a franchisee and its franchisor are ordinarily governed by the terms of the contract they have entered into—namely, the franchise agreement. A franchisee may bring suit under the PMPA only when its franchisor has terminated or declined to renew the franchise agreement. *See id.* at 861 ("[T]here is nothing in the PMPA suggesting that Congress intended for franchisees to sue franchisors under the Act's remedial provisions . . . when a termination or nonrenewal is not at issue.").

4

### 2. The Purpose of "Constructive Termination" Claims

Certain courts have also recognized "constructive termination" claims under the PMPA, though such claims have been limited to one specific context: when a franchisor has assigned the franchise agreement to a third party. *E.g.*, *Marcoux*, 524 F.3d at 45. The PMPA, courts have reasoned, protects three "statutory components" of a franchise: "(1) the right to occupy leased marketing premises; (2) the right to sell motor fuel under a trademark owned or controlled by a refiner; and (3) the right to be supplied with that fuel." *Ackley v. Gulf Oil Corp.*, 726 F. Supp. 353, 361 (D. Conn. 1989) (citing 15 U.S.C. § 2801(1)). An assignment that results in a breach of one of those three statutory components can give rise to a claim of constructive termination under the PMPA. Alternatively, an assignment that violates state law can also give rise to a constructive termination claim. The Sixth Circuit summarized as follows:

> [T]o sustain a claim, under the PMPA, that a franchisor assigned and thereby constructively terminated a franchise agreement, the franchisee must prove either: (1) that by making the assignment, the franchisor breached one of the three statutory components of the franchise agreement, (the contract to use the refiner's trademark, the contract for the supply of motor fuel, or the lease of the premises), and thus, violated the PMPA; or (2) that the franchisor made the assignment in violation of state law and thus, the PMPA was invoked.

*May-Som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d 917, 922 (6th Cir. 1989).[2] Several courts have agreed with that formulation and have addressed claims of constructive termination by applying a similar test. *See, e.g.*, *Marcoux*, 524 F.3d at 45 (citing *Chestnut Hill Gulf v. Cumberland Farms, Inc.*, 940 F.2d 744 (1st Cir. 1991)); *Portland 76 Auto/Truck Plaza, Inc. v. Union Oil Co. of Cal.*, 153 F.3d 938, 948 (9th Cir. 1998); *Beachler v. Amoco Oil Co.*, 112 F.3d

---

[2] It is worth noting that, "in order to establish a claim under the PMPA, the plaintiffs must prove as a threshold matter a termination or nonrenewal of their franchise relationship within the meaning of the PMPA." *Ackley*, 726 F. Supp. at 359 (citing 15 U.S.C. § 2805(c)).

902, 906 (7th Cir. 1997); *Shukla v. BP Exploration & Oil, Inc.*, 115 F.3d 849, 853 (11th Cir. 1997); *Barnes*, 795 F.2d at 360-64.

The point of a constructive termination claim is to allow a franchisee to recover from its former franchisor—that is, from the party that made the assignment. As the First Circuit explained in *Marcoux*, the PMPA "does not contemplate that a franchisee should be relegated to seeking damages from an assignee that might not have the resources to satisfy a judgment." 524 F.3d at 45 (quoting *Barnes*, 795 F.2d at 362). Instead, a franchisee asserting a constructive termination claim may recover against its former franchisor if its franchise has been assigned in a way that effectively terminates it.

Plaintiff has cited no case that has upheld a constructive termination claim outside the context of an assignment.[3] That is no surprise, as "Congress enacted the PMPA to federalize the standards by which petroleum franchises are terminated . . . , not to create a federal common law for governing petroleum franchise agreements." *Dersch*, 314 F.3d at 861-62. Therefore, ongoing disputes between a franchisee and its franchisor—such as the disputes at issue here—are governed by the terms of the franchise agreement, not by the PMPA. It is only when there is a "termination or nonrenewal"—or, under some cases, an assignment—of the franchise that the PMPA comes into play.[4]

---

[3] This Court has located two cases in which the Fifth Circuit intimated that it would recognize constructive termination claims outside the context of an assignment. *Shell v. Shell Oil Co.*, 343 F.3d 482, 487-88 (5th Cir. 2003); *April Mktg. & Distrib. Corp. v. Diamond Shamrock Ref. & Mktg. Co.*, 103 F.3d 28, 30-31 (5th Cir. 1997). Those cases, however, did not actually uphold claims for constructive termination outside the context of an assignment. *See id.* at 487-88 & n.13 (dismissing a constructive termination claim and recognizing that "most circuits have only considered constructive termination claims in cases where the franchisor assigned the franchise agreement to a third party"); *April Mktg.*, 103 F.3d at 29-30. *But see Yonaty v. Amerada Hess Corp.*, No. 3:04-CV-605, 2005 U.S. Dist. LEXIS 22429, at *34-35 (N.D.N.Y. June 20, 2005) (following *Shell* and denying defendants' motion for summary judgment on a constructive termination claim made outside the context of an assignment).

[4] In *Marcoux*, for instance, franchisees brought suit after Shell had assigned their franchise agreements to Motiva. 524 F.3d at 38. The franchisees claimed that Motiva had failed to honor the franchise agreements after the assignment. Thus, the franchisees brought a state law breach of contract claim against Motiva. *Id.* at 38, 43-44. They also brought a PMPA claim against Shell on the theory that Shell had "constructively terminated" the franchise

6

### 3. Plaintiffs' Failure to Plead a Constructive Termination Claim

In this action, plaintiffs do not bring a constructive termination claim in the context of an assignment. Rather, plaintiffs allege that "[b]y charging unconscionable rents" and "charging Plaintiffs inflated prices for wholesale gas and controlling Plaintiffs' requests for the delivery of gasoline, Defendants have and are terminating the Plaintiffs' Franchise Agreements in violation of the [PMPA]." (Second Am. Compl. ¶ 112; *see also id.* ¶ 106.) First, even if that were a proper constructive termination claim, plaintiffs could not bring it against all "Defendants." (*Id.* ¶ 112.) As discussed above, the purpose of a PMPA claim is to allow a franchisee to recover from its former franchisor. Therefore, if plaintiffs could bring a PMPA claim in this action, they could bring it only against their former franchisors, Shell and Texaco.

Second, and more importantly, plaintiffs' allegations do not make out a constructive termination claim pursuant to the PMPA because plaintiffs do not allege that their franchise agreements were constructively terminated by means of an assignment. Indeed, plaintiffs specifically acknowledge that they "have not alleged that their franchise agreements were 'constructively terminated' in connection with an assignment of those agreements." (Defs.' Local R. 56.1 Statement ¶ 2; Pls.' Resp. 56.1 Statement ¶ 2.) It is true that Shell and Texico assigned plaintiffs' franchise agreements to Motiva in 1998. (Defs.' Local R. 56.1 Statement ¶ 3; Pls.' Resp. 56.1 Statement ¶ 3.) But even if plaintiffs were alleging that the constructive

---

agreements by assigning them to Motiva. *Id.* 38-39, 44-47. The court recognized the constructive termination claim, reasoning that a "'franchisor cannot circumvent the protections the [PMPA] affords a franchisee by the simple expedient of assigning the franchisor's obligation to an assignee who increases the franchisee's burden.'" *Id.* at 44-45 (quoting *Barnes*, 795 F.2d at 362).

What is important to note about *Marcoux* is that *Marcoux* recognized a constructive termination claim only against Shell—not against Motiva—and only in connection with an assignment. *See id.* at 45 ("[A]n action for constructive termination lies against the assignor of a franchise when the assignee breaches the franchise."). Insofar as the franchisees in *Marcoux* alleged that their *current* franchisor, Motiva, had breached the franchise agreement, that breach formed the basis of a breach of contract claim against Motiva. Insofar as they alleged that their *former* franchisor, Shell, had terminated their franchise agreements by assigning them to Motiva, that assignment formed the basis of a constructive termination claim against Shell.

7

termination occurred in connection with the assignment of their franchise agreements in 1998—which they are not—those assignments took place so long ago that they could not form the basis of a constructive termination claim in this action. The PMPA establishes a one-year statute of limitations for claims of wrongful termination. 15 U.S.C. § 2805(a). Yet this action was filed in June 2006, eight years after Shell and Texico assigned plaintiffs' franchise agreements to Motiva.

Instead of alleging that an assignment caused a constructive termination, plaintiffs' grievance is that Motiva, their current franchisor, is charging high gas and rent prices in an effort to drive plaintiffs out of business. That conduct, if anything, forms the basis of a state law claim for breach of contract.[5] It does not form the basis of a constructive termination claim pursuant to the PMPA as it is understood in the cases plaintiffs cite. Therefore, since plaintiffs have offered no rationale for why this Court should extend the PMPA beyond the parameters recognized by other courts, summary judgment is granted to defendants with respect to plaintiffs' PMPA claims (Counts One and Two).

B. <u>Actual Termination Under the PMPA</u>

Motiva actually terminated the franchises of only two of the plaintiffs in this action, Sergio Enterprises, Inc., and Monetti & Son, Inc. (Defs.' Local R. 56.1 Statement ¶¶ 6-7; Pls.' Resp. 56.1 Statement ¶¶ 6-7.) According to Motiva, it ended those franchises after it "lost the ground lease for the station premises." (Defs.' Local R. 56.1 Statement ¶¶ 6-7.) The terminations were proper, Motiva maintains, because the PMPA explicitly provides that a franchisor may terminate a franchise following the "loss of the franchisor's right to grant

---

[5] Plaintiffs did bring breach of contract claims based on Motiva's gasoline prices (Second Am. Compl. ¶¶ 131-40) and methods of delivering gasoline (*id.* ¶¶ 141-49). Although the earlier complaints in this action contained a breach of contract claim based on the price Motiva charges for rent (Compl. ¶¶ 135-139; Am. Compl. ¶¶ 140-144), it was omitted from plaintiffs' Second Amended Complaint.

8

possession of the leased marketing premises through expiration of an underlying lease." 15 U.S.C. § 2802(b)(2)(C), (c)(4).

Plaintiffs do not dispute that Motiva terminated the franchise agreements after losing the ground leases for the stations. (Pls.' Resp. 56.1 Statement ¶¶ 6-7.) Nor do plaintiffs make any attempt to respond to Motiva's argument that the terminations were proper under the PMPA. Plaintiffs' Memorandum of Law in Opposition to Summary Judgment makes no mention of the Sergio Enterprise and Monetti & Son franchises, and plaintiffs have submitted no evidence to suggest that Motiva failed to meet all the required conditions for terminating the franchise agreements after it lost the ground leases for the stations. *See* 15 U.S.C. § 2802(c)(4)(A)-(C). Therefore, insofar as this action challenges Motiva's actual termination of the Sergio Enterprise and Monetti & Son franchises, summary judgment for defendants is granted.

   C. The Open Price Term Provision in N.Y. U.C.C. § 2-305

The franchise agreements do not establish a price for the gasoline Motiva sells to plaintiffs. Rather, the franchise agreements provide that Motiva will charge plaintiffs a "dealer tank wagon" ("DTW") price, which is an "open price term" governed by N.Y. U.C.C. § 2-305. N.Y. U.C.C. § 2-305 provides that a "price to be fixed by the seller or by the buyer means a price for him to fix in good faith." Plaintiffs allege that defendants have violated N.Y. U.C.C. § 2-305 by failing to set the DTW price in good faith. (Second Am. Compl. ¶ 137.)

Plaintiffs maintain that, because New York state courts have not applied N.Y. U.C.C. § 2-305 in the context of gasoline franchise agreements, this Court should follow the district court's reasoning in *Yonaty v. Amerada Hess Corp.*, No. 3:04-CV-605, 2005 U.S. Dist. LEXIS 22429 (N.D.N.Y. June 20, 2005). In *Yonaty*, Judge Frederick Scullin surveyed the caselaw and concluded: "Although courts have adopted varying approaches in analyzing whether gasoline

franchisors have set prices in good faith [under U.C.C. § 2-305], it is clear that, in order for Plaintiff to maintain a claim under any of these approaches, he must produce some evidence of improper motive, discriminatory pricing, or the pricing practices of other franchisees." *Id.* at *17 (comparing *Tom-Lin Enters., Inc. v. Sunoco, Inc. (R&M)*, 349 F.3d 277, 282 (6th Cir. 2003); *Callahan v. Sunoco, Inc.*, No. Civ. A. 03-4461, 2005 U.S. Dist. LEXIS 7395 (E.D. Pa. Apr. 28, 2005); and *Shell Oil Co. v. HRN, Inc.*, 144 S.W.3d 429, 434 (Tex. 2004)).  Even if this Court were to adopt Judge Scullin's reasoning in *Yonaty*, however, the evidence plaintiffs have offered cannot support a claim under N.Y. U.C.C. § 2-305.

First, plaintiffs do not submit sufficient evidence to permit a reasonable finder of fact to conclude that defendants set the DTW price with an "improper motive." *Yonaty*, 2005 U.S. Dist. LEXIS 22429, at *17.  Plaintiffs point to a small amount of evidence suggesting that defendants (it is not clear whether this is Shell, Motiva, or both) intend eventually to stop selling gasoline through franchises and instead sell gasoline through a "wholesale network."  In support of that alleged "improper motive," plaintiffs offer statements from their expert as well as defendants' expert recognizing a trend among the major oil companies to move away from the franchise model of gasoline sales. (*See* Expert Report of John Umbeck 15, May 5, 2008 ("Umbeck Report"), Ex. K to Defs.' Mem. in Supp. of Summ. J.; Expert Report of Jeffrey Bernard 5, Dec. 21, 2007 ("Bernard Report"), Ex. G to Pls.' Mem. in Opp. to Summ. J.)  Plaintiffs also cite the deposition testimony of Jeffrey Rubin, "Defendants' North American Pricing Manager," who, when asked whether he was "aware of a corporate goal by Shell to convert the RORO [i.e., franchise] dealers to other types of dealers," replied "No," and then elaborated, "Actually, our current strategy is to move to a wholesale—basically a wholesale network."  (Dep. of Jeffery Rubin 76-77, Ex. B to Pls.' Mem. in Opp. to Summ. J.)

10

That is not enough evidence to create a genuine issue of fact, as a reasonable juror could not conclude, based solely on defendants' desire to exit the franchise market, that Motiva has set its gasoline price in bad faith.  Plaintiffs have submitted no evidence whatsoever establishing a link between defendants' alleged desire to exit the franchise market on the one hand and the DTW pricing system on the other, let alone any evidence suggesting that defendants have attempted to force plaintiffs out of business by means of unwarranted DTW prices.  At the very most, plaintiffs have introduced a smidgen of evidence of defendants' general intent to exit the market for gasoline franchises.  That does not, without more, support an inference that Motiva acted with an improper motive when it set gasoline prices for the particular plaintiffs in this action.

Second, plaintiffs offer no evidence that defendants have engaged in "discriminatory pricing."  *Yonaty*, 2005 U.S. Dist. LEXIS 22429, at *17.  The Second Amended Complaint alleges that defendants charged lower gasoline prices to other types of retailers—such as "multi-site operators" and "jobbers"—than defendants charged to plaintiffs. (Second Am. Compl. ¶ 137-38.)  Plaintiffs have not, however, submitted any evidence in support of that allegation.  Even if they had offered such evidence, moreover, it would be insufficient to demonstrate discriminatory pricing.  As franchisees, plaintiffs do not appear to be in the same "class of trade" as multi-site operators and jobbers, and "[e]vidence that different prices are available to different classes of trade is not evidence of bad faith under section 2-305."  *HRN, Inc.*, 144 S.W.3d at 438 (citing *Ajir v. Exxon Corp.*, No. C 93-20830, 1995 WL 261412, at *4 (N.D. Cal. May 2, 1995)).

Third, plaintiffs have made no attempt to show that the DTW prices Motiva charged to plaintiffs were out of "the range of DTW prices charged by other refiners in the market," *id.* at 434, and thus plaintiffs cannot show bad faith by reference to "the pricing practices of other

11

franchisees," *Yonaty*, 2005 U.S. Dist. LEXIS 22429, at *17. Even plaintiffs' expert report discussed only plaintiffs' ability to make a profit given Motiva's DTW prices (Bernard Report 7-12) and did not express any opinion about whether Motiva's DTW prices reflected "the pricing practices of other franchisees."[6] *Yonaty*, 2005 U.S. Dist. LEXIS 22429, at *17. Indeed, plaintiffs admit that their expert "did not compare Motiva's DTW prices with those of other major branded oil companies in New York" and "expressed no opinion as to whether or not Motiva's DTW was within the range of other branded marketers." (Defs.' Local R. 56.1 Statement ¶ 8 (citing Dep. of Jeffery Bernard 170-71, Mar. 27, 2008, Ex. I to Defs.' Mem. in Supp. of Summ. J.); Pls.' Resp. 56.1 Statement ¶ 8.) Defendants' expert, by contrast, analyzed recent DTW prices from Long Island and Queens—where most of plaintiffs' gas stations are located—and concluded that "Motiva's DTW prices are within the range of the DTW prices charged daily by other major brand oil companies." (Defs.' Local R. 56.1 Statement ¶ 8 (citing Umbeck Report 10-12); Pls.' Resp. 56.1 Statement ¶ 8.) Plaintiffs offer no grounds to rebut that assertion.

Plaintiffs' evidence, therefore, is insufficient to support a claim that defendants violated N.Y. U.C.C. § 2-305 by failing to set the DTW prices in good faith. Even applying *Yonaty*, plaintiffs have been unable to provide "some evidence of improper motive, discriminatory pricing, or the pricing practices of other franchisees." 2005 U.S. Dist. LEXIS 22429, at *17. Accordingly, summary judgment is granted to defendants with respect to plaintiffs' N.Y. U.C.C. § 2-305 claim (Count IV).

---

[6] Plaintiffs' expert did opine that "Shell" charged plaintiffs rent that was out of step with "industry practices." (Bernard Report 3.) As discussed above, however, plaintiffs do not bring a breach of contract suit based on rent prices.

### III.   CONCLUSION

Because (1) plaintiffs' constructive termination claim under the Petroleum Marketing Producers Act falls outside the parameters of that statute, (2) plaintiffs have provided no support for a claim of actual termination under the PMPA, and (3) plaintiffs have failed to submit evidence that defendants have violated the open price term provision of N.Y. U.C.C. § 2-305, summary judgment is granted to defendants on each of the remaining counts in the Second Amended Complaint. Accordingly, defendants' motion is granted and the Clerk of Court is directed to enter judgment for defendants.

Dated: New York, New York
      March 11, 2009

SO ORDERED:

_____
Sidney H. Stein, U.S.D.J.